**RECORD NO. 21-4687**

*In The*

# United States Court of Appeals
### For The Fourth Circuit

## UNITED STATES OF AMERICA,

*Plaintiff – Appellee,*

**v.**

## ALEXANDER HILLEL TREISMAN,
## a/k/a Alexander S. Theiss,

*Defendant – Appellant.*

## ON APPEAL FROM THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
## AT GREENSBORO

―――――――――

### BRIEF OF APPELLANT

―――――――――

**Daniel M. Blau**
**DANIEL M. BLAU, ATTORNEY AT LAW, PC**
**887A Washington Street**
**Raleigh, North Carolina 27605**
**(919) 256-3606**

*Counsel for Appellant*

# **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ................................................................. iii

JURISDICTIONAL STATEMENT ...................................................... 1

STATEMENT OF ISSUES PRESENTED............................................ 2

STATEMENT OF THE CASE............................................................. 3

STATEMENT OF FACTS ................................................................... 5

SUMMARY OF ARGUMENT ...........................................................15

ARGUMENT .......................................................................................17

    I.      The District Court erred by concluding that officers had reasonable grounds to enter and search Mr. Treisman's van because a hypothetical person in the van was probably in medical distress and needed immediate help ....................................17

          A.    Standard of review .................................................17

          B.    Community caretaking and the emergency doctrine ...............17

          C.    There was no emergency requiring immediate entry into the van ..................................................................20

    II.     The District Court erred by concluding that the warrantless impoundment and inventory search of Mr. Treisman's van was reasonable under the community caretaking exception to the warrant requirement ..........................................................24

          A.    Standard of review .................................................24

          B.    Vehicle searches and seizures based on community caretaking ...........................................................24

C.    The impoundment and inventory search here did not meet the criteria for reasonable police action under the community caretaking exception ...............................................25

    1.    The officers did not have lawful custody of the van ......25

    2.    The officers did not conduct the inventory search pursuant to standard criteria and procedures .................29

    3.    The inventory search was pretextual .............................31

CONCLUSION ........................................................................................36

REQUEST FOR ORAL ARGUMENT ..................................................37

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF FILING AND SERVICE

ii

<u>**TABLE OF AUTHORITIES**</u>

<u>**Page(s)**</u>

<u>**CASES**</u>

*Cady v. Dombrowski*,
    413 U.S. 433 (1973)..........................................................................17, 18, 34

*Colorado v. Bertine*,
    479 U.S. 367 (1987)..................................................................................30, 31

*Hunsberger v. Wood*,
    570 F.3d 546 (4th Cir. 2009), *cert. denied*,
    559 U.S. 938 (2010)..................................................................................19, 20

*Massachusetts v. Gordon*,
    29 N.E.3d 856 (Mass. App. 2014), *review denied*,
    36 N.E.3d 30 (Mass. 2015).......................................................................21, 22

*Minnesota v. Dickerson*,
    508 U.S. 366 (1993)........................................................................................24

*New York v. Class*,
    475 U.S. 106 (1986)........................................................................................33

*North Carolina v. Phifer*,
    254 S.E.2d 586 (N.C. 1979) ..............................................................29, 31, 32

*Ornelas v. United States*,
    517 U.S. 690 (1996)........................................................................................17

*Sansbury v. Indiana*,
    96 N.E.3d 587 (Ind. App. 2017) ....................................................................33

*South Dakota v. Opperman*,
    428 U.S. 364 (1976)........................................................................................25

*United States v. Brown*,
787 F.2d 929 (4th Cir.), *cert. denied*,
479 U.S. 837 (1986)..............................................................25

*United States v. Gillespie*,
332 F. Supp. 2d 923 (W.D. Va. 2004).........................................20, 21, 22, 23

*United States v. Gwinn*,
219 F.3d 326 (4th Cir.), *cert. denied*,
531 U.S. 1025 (2000)...........................................................17, 24

*United States v. Johnson*,
410 F.3d 137 (4th Cir.), *cert. denied*,
546 U.S. 952 (2005)............................................................31, 32

*United States v. Marshall*,
747 Fed. Appx. 138 (4th Cir. 2018), *cert. denied*,
139 S. Ct. 1214 (2019)..........................................................18, 19

*United States v. Matthews*,
591 F.3d 230 (4th Cir. 2009), *cert. denied*,
562 U.S. 995 (2010)............................................................29, 30

*United States v. McKenzie-Gude*,
671 F.3d 452 (4th Cir. 2011) .................................................17, 24

*United States v. Mitchem*,
545 F. Supp. 3d 374 (S.D. W. Va. 2021) ....................................21, 22

*United States v. Moss*,
963 F.2d 673 (4th Cir. 1992) ..........................................18, 19, 20, 22

*United States v. Turnbow*,
812 Fed. Appx. 632 (9th Cir. 2020) ...........................................32

*United States v. Williams*,
354 F.3d 497 (6th Cir. 2018) .................................................21, 22

*United States v. Woodard*,
5 F.4th 1148 (10th Cir. 2021) ................................................25, 31

## **CONSTITUTIONAL PROVISION**

U.S. Const. amend. IV ...................................................................*passim*

## **STATUTES**

18 U.S.C. § 2252A(a)(1)................................................................1, 3

18 U.S.C. § 2252A(a)(5)(B) .........................................................1, 3

18 U.S.C. § 2252A(b)(1)...............................................................1, 3

18 U.S.C. § 2252A(b)(2)...............................................................1, 3

18 U.S.C. § 3231 ...............................................................................1

28 U.S.C. § 1291 ..............................................................................1

N.C. Gen. Stat. § 15A-285 .....................................................8, 14, 19

N.C. Gen. Stat. § 20-137.9 ............................................................29

N.C. Gen. Stat. § 20-137.10 ..........................................................29

## **OTHER AUTHORITIES**

Kannapolis Code of Ordinances, Sections 10-231 *et seq* .......................26

Kannapolis Code of Ordinances, Section 10-232 ..................................26

Kannapolis Code of Ordinances, Section 10-232(4) ..............................26

Kannapolis Code of Ordinances, Section 10-236(a) ..............................26

Kannapolis Code of Ordinances, Section 10-238 ..................................26

Kannapolis Code of Ordinances, Section 10-238(2) ..............................26

Kannapolis Police Department General Order 900-02 .....................*passim*

# JURISDICTIONAL STATEMENT

Defendant Alexander Treisman appeals from a final judgment entered upon his guilty pleas in case number 1:20-CR-208 (M.D.N.C.) to one count of possession of child pornography, in violation of 18 U.S.C. §§ 2252A(a)(5)(B) and (b)(2), and two counts of transportation of child pornography, in violation of 18 U.S.C. §§ 2252A(a)(1) and (b)(1).

The District Court sentenced Mr. Treisman on 12 October 2021 and entered a written judgment against him on 30 November 2021. Mr. Treisman filed a notice of appeal from the judgment on 14 December 2021. The District Court later entered an amended judgment including a restitution order on 14 April 2022, and Mr. Treisman filed an additional notice of appeal from the amended judgment on 28 April 2022.

The District Court had jurisdiction under 18 U.S.C. § 3231, and this Court has jurisdiction under 28 U.S.C. § 1291.

## **STATEMENT OF ISSUES PRESENTED**

I.     Did the District Court err by concluding that officers had reasonable grounds to enter and search Mr. Treisman's van because a hypothetical person in the van was probably in medical distress and needed immediate help?

II.    Did the District Court err by concluding that the warrantless impoundment and inventory search of Mr. Treisman's van was reasonable under the community caretaking exception to the warrant requirement?

## <u>STATEMENT OF THE CASE</u>

Defendant Alexander Treisman was charged in a three-count Superseding Indictment filed in the Middle District of North Carolina on 28 September 2020 in case number 1:20-CR-208. Count One charged Mr. Treisman with possession of child pornography, in violation of 18 U.S.C. § 2252A(a)(5)(B) and (b)(2). Counts Two and Three charged Mr. Treisman with transportation of child pornography, in violation of 18 U.S.C. § 2252A(a)(1) and (b)(1). (J.A. 16)

Mr. Treisman filed a Motion to Suppress on 13 January 2021 (J.A. 19) that came on for a hearing before the District Court on 22-26 February 2021. The District Court entered an order in open court denying Mr. Treisman's motion on 26 February 2021. Mr. Treisman subsequently pled guilty to all counts in the Superseding Indictment pursuant to a written plea agreement on 10 March 2021. (J.A. 519)

The case came on for sentencing on 22 September 2021 and 12 October 2021. The District Court sentenced Mr. Treisman to an active term of 156 months in prison on 12 October 2021, followed by fifteen years of supervised release. The District Court filed a written judgment against Mr. Treisman on 30 November 2021 (J.A. 542), with a restitution hearing to follow. Mr. Treisman filed a written notice of appeal from the judgment on 14 December 2021. (J.A. 550)

The District Court held a restitution hearing on 11 February 2022, and subsequently entered an amended judgment that included a restitution order on 14

April 2022. (J.A. 558) Mr. Treisman filed an additional notice of appeal from the amended judgment on 28 April 2022. (J.A. 566)

## **STATEMENT OF FACTS**

Fifth Third Bank has a branch in Kannapolis, North Carolina. Bank employees parked in one particular part of the bank parking lot (J.A. 124); however, there was no signage indicating that particular area of the parking lot was for employee parking. There were also no signs in the parking lot indicating that it was a private lot, or that overnight parking was not allowed, or that vehicles left in the lot would be towed. (J.A. 145) There was a walking trail near the bank, and it was not unusual for people to park in the bank to use that trail. (J.A. 125)

Bank manager Crystal Wright arrived at work on the morning of 28 May 2020 and noticed a white van in the section of the parking lot where employees would usually park. She recalled that the van had been there the previous evening. (J.A. 124) The van was not blocking any traffic in the parking lot (J.A. 145); nonetheless, Ms. Wright decided to call the police so they could run the tags and attempt to contact the owner. The bank also had a towing service they typically used to tow vehicles from their parking lot. (J.A. 126)

Officer Nathan Lambert with the Kannapolis Police Department (KPD) responded to the call for service and arrived at the bank around 10:50 a.m. (J.A. 270) He looked at the van and saw that it was a white, panel-style work van with a front cabin and a partition separating the cabin from the rear cargo area. It had front cabin doors, rear doors, and side doors on the passenger side. There was an air

5

conditioning unit on top of the cargo area.  There were no windows in the cargo area, and so it was not possible to see into the cargo area. (J.A. 194, 272)

Officer Lambert noticed that the van had an expired California license tag. He ran the tag in his computer system and saw that it was associated with a van. There was also a Vehicle Identification Number (VIN) listed. (J.A. 271-72) Officer Lambert walked to the front of the van to see if anyone was inside.  He looked in the front cabin and did not see anyone.  However, he did see an AR-style rifle leaned against the driver's seat, a box of ammunition near the dash, a plastic container of Tannerite[1] on the floorboard, and a closed handgun box on the passenger side.  None of the things he saw in the van were illegal, but he did think they were unusual. (J.A. 273) He also saw that the VIN on the van's dashboard was partially covered by a Days Inn parking pass, so he could not match it to the VIN associated with the license plate in his computer system. (J.A. 275)

Officer Lambert called his supervisor, Sergeant Tim Lafferty, to tell him about the situation.  Sergeant Lafferty told Officer Lambert to check if the bank had any surveillance footage of the parking lot. (J.A. 275-76) Officer Lambert went inside

---

[1] The Government explained to the District Court that "Tannerite is a binary explosive often used by target shooters.  When its binary components are mixed, Tannerite becomes an explosive material.  Thus, it is popular among target shooters because it produces an explosion and smoke when hit by a bullet.  Tannerite is legal to own and transport in its unmixed form, however, when mixed it can be dangerous depending upon how it is used." (J.A. 32)

the bank to speak with Ms. Wright; she then spoke with the bank's IT department and learned there were no surveillance cameras in the parking lot. (J.A. 276-77) Officer Lambert also told Ms. Wright about the things he had seen in the van. Ms. Wright became concerned because she did not know what the owner of the van was planning to do, or if the weapons were going to be used against the bank. (J.A. 131) Ms. Wright expressed those concerns to Officer Lambert (J.A. 130) and asked him if he could tow the van. Officer Lambert explained that KPD usually did not tow vehicles from private property, but he agreed to speak with his supervisor to see what options might be available. (J.A. 278)

Officer Brandon Wagner arrived at the bank around 12:00 p.m. to assist Officer Lambert. When he arrived, Officer Lambert was inside the bank speaking with Ms. Wright. (J.A. 193-94, 227) Officer Wagner walked around the van before going inside the bank. He saw the same items in the front cabin that Officer Lambert had seen, along with a black suitcase on the passenger side of the cab. Officer Wagner also noticed that the side door to the rear cargo area appeared to be ajar, because the lines on the door seam were slightly off (J.A. 194-95, 235-36). After looking at the van, Officer Wagner went into the bank to speak with Officer Lambert. (J.A. 231-32)

Officers Lambert and Wagner stayed in the bank for about 10-15 minutes and tried to figure out how the bank wanted to handle the van. (J.A. 204-05, 231) They

had not been able to determine who owned the van, because when they ran the license plate, it did not show a registered owner. (J.A. 205-06) The officers then walked back out to the van and called Sergeant Lafferty again. (J.A. 279) Although Sergeant Lafferty was not at the scene, he told Officer Wagner that based on the hot weather and the partition between the cabin and cargo area, it was possible that someone was in the back of the van in medical distress, and that the officers should search the back of the van based on urgent necessity under N.C. Gen. Stat. § 15A-285.[2] (J.A. 368-69, 392-93) No one had been seen coming to or from the van, and the officers had not heard any noises coming from the van (J.A. 207, 274); nonetheless, Officer Wagner agreed with Sergeant Lafferty that because the air conditioning unit on top of the van was not on, someone who might have been living in the back of the van was "probably in medical distress." (J.A. 236)

Officers Lambert and Wagner then approached the van. Neither of the officers knocked on the van to see if there was a response. Neither of the officers called out to ask if there was anyone in the van. (J.A. 232), Rather, due to the "immediate need" to make sure no one required medical assistance (J.A. 238), the officers opened the side door of the van. They did so at 12:28 p.m., about an hour and a half after Officer Lambert had first arrived at the bank. (J.A. 308) As Officer

---

[2] *See* N.C. Gen. Stat. § 15A-285 (2021) (allowing a police officer to enter a vehicle when the officer "reasonably believes that doing so is urgently necessary to save life [or] prevent serious bodily harm").

Lambert pulled the door handle, the door swung open. This surprised Officer Wagner, who immediately drew his gun as a precaution.[3] (J.A. 207-08, 263-64)

The officers looked into the cargo area and did not see anyone, but they wanted to check further and make sure. (J.A. 239) There was a large cardboard box that blocked their view of part of the cargo area (J.A. 209), so Officer Lambert attached a flashlight to his pistol and got into the van to look over the box.[4] (J.A. 212-13, 240) The officers still did not see anyone in the van, but they did find a number of additional firearm cases in the cargo area. (J.A. 215-16, 244-45, 282) They moved one of the firearm cases and noticed that it was heavy. (J.A. 243) Officer Wagner also noticed that the side door seemed to stay unlocked even when the locking mechanism was engaged, and he did not think the door could be locked. (J.A. 266-67) Rather than attempting to secure the van further after the initial search, however, the officers left the van doors open from that point onward. (J.A. 213)

Officer Wagner was concerned about having unsecured firearms in a public area, and was not sure if the van could be secured. (J.A. 210-11) The officers called Sergeant Lafferty again and told him that there were additional weapons in the back

---

[3] At the suppression hearing, Officer Lambert testified that the officers' chief concern was the safety of the hypothetical person in the back of the van, but he also agreed with defense counsel that there potentially could have been "somebody up to no good" in the back of the van. (J.A. 303)

[4] A bank employee who was eating lunch in the parking lot around that time texted a co-worker that the officers were "in the van." (J.A. 179) She later testified, however, that she meant that the officers were "around the van." (J.A. 179)

of the van. (J.A. 282) Sergeant Lafferty came to the bank and saw that Officers Wagner and Lambert had already opened the cargo doors. (J.A. 370-71) Even though those officers had already checked the cargo area, Officer Lafferty also looked into the van and tried to see behind the box to make sure the other officers had not missed anything. (J.A. 381, 396) He then tried to run the van's license plate through additional databases, and was able to find a registered owner, although he could not remember the person's name. (J.A. 373-74) Because the Days Inn parking pass was blocking the van's VIN, he also called various Days Inn hotels in the area to try to find information on the possible owner. (J.A. 372-74)

KPD Captain Justin Smith also arrived at the bank around that time. (J.A. 311-12) Captain Smith knew that KPD generally did not tow vehicles from private property (J.A. 326) and that abandoned vehicles were typically removed by the city zoning administrator. However, he thought that because the van had weapons in it, the zoning administrator would request police assistance anyway. (J.A. 314-15) He also did not think the bank could have the van towed on its own, because tow operators usually would not tow vehicles with weapons inside them. (J.A. 331)

After speaking with his own supervisor, Captain Smith determined that KPD policy allowed him to have the van towed if the bank made the request in writing. (J.A. 326-27, 331-32) Captain Smith had never used or even seen a KPD tow-request form before, and could not recall any other officer ever using it (J.A. 352-53);

10

nonetheless, he told the other officers that if they had the bank sign a tow-request form, they could conduct an inventory search on the van and then tow it from the parking lot. (J.A. 331) Captain Smith did not know whether a crime had been committed or not, but he felt that police needed to inventory the weapons and hold them for safekeeping. (J.A. 334) Officer Lambert also did not know of any way for police to get the firearms except by having the van towed, which would allow them to do an inventory search. (J.A. 307)

The officers could not perform the inventory search without Ms. Wright's signature (J.A. 248), so they brought her the tow-request form and asked her to grant KPD permission to tow the van.  She signed the form around 1:38 p.m. after receiving authorization from the bank security staff. (J.A. 134-35, 137, 155-56) The officers then began to search the van in order to locate and inventory any valuables belonging to the owner prior to the van being towed. (J.A. 219, 382) They took the large cardboard box from the van and used it as a table. (J.A. 384-85) As Officer Wagner located additional firearms in the cargo area, he gave them to Sergeant Lafferty, who put them into a pile and started running the serial numbers to determine if they were stolen. (J.A. 252-53, 403)

As officers continued their search, they found various documents with the name "Alexander Treisman" on them.  They tried to make contact with Mr. Treisman (J.A. 376-77, 385), but continued the inventory search in the meantime.  In addition

11

to finding other firearms and ammunition, the officers also found a 4K flat-screen television, a drone, and a number of books, including a novel, an Army survival guide, a book about killing and dying, and three books about improvised weapons or explosives. (J.A. 223-25, 255-56) Towards the back of the van, Officer Wagner found a large black duffle bag. He passed it to other officers, who began to search it. In the bag, they found a pistol and multiple sealed bank bags containing approximately $500,000 in cash.[5] (J.A. 225-26, 339)

After finding the cash, Captain Smith believed that officers had uncovered evidence of a crime. He stopped the inventory search so they could apply for a search warrant for the van. (J.A. 339) Meanwhile, Officer Lambert completed the paperwork for the inventory search. (J.A. 282) Although he knew that the purpose of an inventory search was to list all of the valuable items in a vehicle in order to protect the owner's property and to protect police from accusations of theft (J.A. 304), he only listed "FIREARMS" and "CASH" on the inventory sheet as the items removed from the van. (J.A. 578) He did not make an itemized list of the firearms, despite the fact that Sergeant Lafferty had already gone through the firearms individually to run their serial numbers.

---

[5] FBI agents later determined that Mr. Treisman was the legal owner of the money, which was an inheritance from his father. The money was returned to Mr. Treisman. (J.A. 37, 340)

After the inventory search, police seized the van and had it towed to a police storage facility so they could search it pursuant to a search warrant. (J.A. 307-08) Shortly thereafter, around 3:17 p.m., Mr. Treisman returned to the bank and inquired about his missing van. (J.A. 37, 140-41) Ms. Wright called the police, who came back and detained Mr. Treisman. (J.A. 37-38, 142-43) KPD officers obtained a state search warrant for the van about an hour after that. (J.A. 37) A few days later, FBI agents relied on evidence found in the van to obtain a federal search warrant for Mr. Treisman's cell phone. (J.A. 42, 63-65) Officers discovered images of child pornography while searching Mr. Treisman's phone (J.A. 42), and he was ultimately indicted in this case based on the evidence found in his phone.

Mr. Treisman filed a Motion to Suppress on 13 January 2021 challenging the search of his van. (J.A. 19) In his motion, Mr. Treisman first argued that officers did not have an objectively reasonable belief that an emergency existed that required them to immediately enter the van without a warrant to see if anyone was in medical distress inside. (J.A. 21-22) He next argued that officers did not have legal authority to tow the van, and that the inventory search was a pretext for a warrantless criminal investigation. (J.A. 22-26)

Mr. Treisman's motion to suppress came on for a hearing before the District Court on February 22-26, 2021.[6]  After hearing evidence and arguments from the parties, the District Court denied the motion. (J.A. 477) As to the initial search, the Court held that it was reasonable for the officers to open the van and conduct a welfare check on whoever might be inside, based either N.C.G.S. § 15A-285 or the community-caretaking exception to the Fourth Amendment's warrant requirement. (J.A. 483-85, 499-501) The District Court further concluded that: the van presented a public-safety concern; the officers had legal authority to tow the van; the officers impounded and inventoried the van in good faith based on the community caretaking exception; and that the officers had not acted with a purpose of investigating a potential crime or gathering evidence. (J.A. 474-78, 497-98, 502-08)

---

[6] The parties have included the documentary exhibits from this hearing in Volume Two of the Joint Appendix.  Defendant's Exhibits 8 and 9 were not included in the Joint Appendix because they were duplicates of documents introduced by the Government.  Government's Exhibits 1 and 4 were digital exhibits, and included Ms. Wright's telephone call to police and the officers' body-camera footage from the incident.  The digital exhibits were retained by the Clerk of Court for the Middle District of North Carolina and are available at this Court's request.

14

## SUMMARY OF ARGUMENT

In order to enter a vehicle without a warrant to address a medical emergency, officers must have an objectively reasonable belief that an emergency existed that required them to enter immediately to render assistance or prevent harm to a person inside. The officers' belief must be based on articulable facts showing that a person is actually inside the vehicle and that the person actually needs assistance; otherwise, the purported emergency is considered too speculative and will not support a warrantless entry. In this case, the officers' concerns that someone was inside the van and in medical distress were based on speculation, and not on any articulable facts showing that to be true. The District Court therefore erred in concluding that the officers' beliefs were reasonable and that their warrantless entry into Mr. Treisman's van was permissible under the Fourth Amendment.

Additionally, police may sometimes impound a vehicle and inventory its contents under the community-caretaking exception to the Fourth Amendment's warrant requirement. Because the authority to impound a vehicle is subject to abuse, however, police may only perform an inventory search if the vehicle is in their lawful custody, the inventory is conducted pursuant to standard criteria, and the search is not a mere pretext for gathering incriminating evidence. In this case, the officers did not follow local ordinances or their own internal regulations when impounding Mr. Treisman's van, and they had unrestricted discretion to determine whether to

15

conduct an inventory search.  The totality of the circumstances also demonstrated

that the inventory search was a pretext to uncover evidence of possible criminal

activity.  The District Court therefore erred in concluding that the officers' actions

were reasonable and that their warrantless impoundment and inventory search of Mr.

Treisman's van were permissible under the Fourth Amendment.

## **ARGUMENT**

I.    The District Court erred by concluding that officers had reasonable grounds to enter and search Mr. Treisman's van because a hypothetical person in the van was probably in medical distress and needed immediate help.

    A.    <u>Standard of review</u>

This Court reviews a District Court's findings of fact for clear error, and reviews its legal conclusions *de novo*. *See, e.g.*, *United States v. McKenzie-Gude*, 671 F.3d 452, 458 (4th Cir. 2011). "*De novo* review is [also] preferred for determinations of whether a search or seizure violates the Fourth Amendment." *United States v. Gwinn*, 219 F.3d 326, 332 (4th Cir.), *cert. denied*, 531 U.S. 1025 (2000).

    B.    <u>Community caretaking and the emergency doctrine</u>

The Fourth Amendment protects "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. The Supreme Court has cautioned that "except in certain carefully defined classes of cases, a search of private property without proper consent is 'unreasonable' unless it has been authorized by a valid search warrant." *Cady v. Dombrowski*, 413 U.S. 433, 439 (1973) (quotation omitted); *see also, e.g.*, *Ornelas v. United States*, 517 U.S. 690, 699 (1996) (recognizing that "the Fourth Amendment demonstrates a strong preference for searches conducted pursuant to a warrant" (quotation omitted)). Two of the recognized exceptions to the warrant

requirement are the community caretaking exception and the closely-related emergency doctrine.

In *Cady*, the Supreme Court recognized that police officers will frequently come into contact with vehicles in situations where there is no suspicion of criminal wrongdoing, such as when officers assist with disabled vehicles or no-fault accidents. *See Cady*, 413 U.S. at 441. In these types of situations, the officers "engage in what, for want of a better term, may be described as community caretaking functions, totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." *Id.* Courts will uphold a warrantless search under the community caretaking exception "if the officers acted reasonably pursuant to objective criteria stated in a routine police policy that is based on community caretaking concerns." *United States v. Marshall*, 747 Fed. Appx. 138, 145 (4th Cir. 2018) (unpublished), *cert. denied*, 139 S. Ct. 1214 (2019).

The emergency doctrine, though similar, is better understood as a subset of the exigent circumstances exception to the warrant requirement. Under the emergency doctrine, "the person making entry must have had an objectively reasonable belief that an emergency existed that required immediate entry to render assistance or prevent harm to persons or property within." *United States v. Moss*, 963 F.2d 673, 678 (4th Cir. 1992). An emergency search must "be limited by the

type of emergency involved," and "cannot be used as the occasion for a general

voyage of discovery unrelated to the purpose of the entry." *Id.*

> This Court has explained that, in some cases,

> analyzing [a] defendant's claim requires us to parse the distinction
> between the two exceptions to the warrant requirement. The doctrines
> overlap conceptually. For example, [certain types of searches] could
> be justified under a community caretaking rationale, as well as under
> the exigent circumstances doctrine. Nonetheless, as a doctrinal matter,
> the two exceptions are not the same. The community caretaking
> doctrine requires a court to look at the *function* performed by a police
> officer, while the emergency exception requires an analysis of the
> *circumstances* to determine whether an emergency requiring immediate
> action existed. Thus, . . . the doctrines have different intellectual
> underpinnings.

*Hunsberger v. Wood*, 570 F.3d 546, 554 (4th Cir. 2009) (cleaned up, alterations

added, emphases in original), *cert. denied*, 559 U.S. 938 (2010).

The District Court in this case concluded that the officers' welfare check was

reasonable under either the community caretaking exception or the "urgent

necessity" exception in N.C.G.S. § 15A-285 (J.A. 484), which is codification of the

emergency doctrine that allows officers to enter vehicles when reasonably necessary

to save a life or prevent serious bodily harm. Because the officers cited N.C.G.S.

§ 15A-285 as their basis for the entry and did not claim the were acting "pursuant to

objective criteria stated in a routine police policy" when conducting the welfare

check, *Marshall*, 747 Fed. Appx. at 145, their actions are properly analyzed under

the emergency doctrine, rather than the community caretaking exception. *See*

19

*Hunsberger*, 570 F.3d at 554-55. The distinction is not critical here, however, because the officers' warrantless search was not objectively reasonable under either standard.

C.    <u>There was no emergency requiring immediate entry into the van</u>

This and other Courts have required that officers' justifications for an emergency search be real, and not speculative or manufactured. In *Moss*, for example, a forest-service officer found a car that was parked illegally and blocking access to a road near a rental cabin. The officer feared that the owner of the car might be lost or hurt. He entered the cabin to attempt to locate the owner, and found a bag of marijuana inside. *Moss*, 963 F.2d at 675. This Court held that the officer had no objectively reasonable basis to conclude that there was an emergency requiring immediate entry into the cabin. *Id.* at 678. To the contrary, there was no indication that someone was inside the cabin, and there was no real sense of emergency related to the potential occupant's safety. *Id.* at 679.

A District Court within the Fourth Circuit had similar concerns in *United States v. Gillespie*, 332 F. Supp. 2d 923 (W.D. Va. 2004). There, officers knocked on an apartment door to serve a warrant. When there was no answer, officers discovered that the apparent subject of the warrant had snuck out of the back door. *Id.* at 925-26. The officers knew the person had two young children, and they could hear a child crying, but they could not tell which apartment the sound was coming

20

from. *Id.* at 926.  The officers eventually asked the owner of the apartment to open the door, which he did.  The officers entered and found no children, but did find contraband. *Id.*  The Court held that there was no emergency that justified the officers' immediate entry into the apartment. *Id.* at 927-28.  The Court found particularly notable that the officers had waited outside the apartment for an hour before calling the owner to let them in, whereas if they truly believed the children were in immediate danger, they would have forced their way into the apartment much sooner. *Id.* at 928.

Other courts have reached similar conclusions when an officer's decision to conduct an emergency entry was based on speculation, rather than on objective facts that a person needed immediate assistance. *See, e.g.*, *United States v. Williams*, 354 F.3d 497 (6th Cir. 2018) (where a teenage girl's parents were concerned that she was in a hotel room with an older man, and officers had knocked on the door and received no response, their entry into the hotel room was not justified under the emergency doctrine or community caretaking exception because the officers did not have actual information that the girl was in the room or that she was in immediate danger); *compare id. with United States v. Mitchem*, 545 F. Supp. 3d 374, 377-78, 383 (S.D. W. Va. 2021) (officer performed a valid community-caretaking welfare check when he entered a car to assist an unconscious driver who had not responded to her knocking on the car); *Massachusetts v. Gordon*, 29 N.E.3d 856 (Mass. App. 2014)

(emergency entry into apartment was valid where neighbors heard a disturbance in the apartment, a woman staying in the apartment was upset and frantic and went to a nearby bar and asked the bartender to call police, the woman then returned to the apartment building, but no one answered after police knocked on the apartment door), *review denied*, 36 N.E.3d 30 (Mass. 2015).

In this case, it was not reasonable for the officers to conclude that an emergency existed that required them to immediately enter and search the van in order to render assistance to a person inside. Neither the police nor Ms. Wright had seen anyone in or around the van either that day or the evening before. There was no damage to the van suggesting that it had been in an accident. There was no evidence of any clothing, blood, debris, or other items in the area around the van that would have indicated that some sort of altercation had taken place. The officers never heard any sounds coming from the van to suggest that someone was inside. The facts of this case are more similar to *Moss* and *Williams*, where officers had no real evidence that a person was actually inside the place to be searched, than they are to *Mitchem* and *Gordon*, where officers had either seen the person themselves or there was direct evidence that a person at the location was experiencing an emergency and had requested help.

In addition, there are other factors that make the officers' determination in this case particularly unreasonable. As in *Gillespie*, the officers' belief that an immediate

warrantless entry was necessary to save someone's life was belied by the fact that officers had been on the scene for over an hour and a half prior to making the entry. Neither Officer Lambert nor Officer Wagner ever once knocked on the van or called out to ask if someone was in the van. It was not until they called their supervisor to discuss other options that the suggestion was made – by an officer not even on the scene – that a person was probably in medical distress in the van, and that the officers should enter the van immediately to render aid to that person. And again, even if the officers thought it was possible that someone was in the van and needed help, there was no legitimate reason why the officers would not have knocked on the van or called out to the person at that point. Instead, they opened the van doors, drew their weapons, entered the van, and looked around it with a flashlight. It is also notable that Sergeant Lafferty searched the van when he arrived on the scene, even though two officers had already swept the van and found no one inside.

The District Court concluded that the officers' belief was reasonable based on the fact that the van had an out-of-state license plate, there was a suitcase in the front cab, it was a warm day and the air conditioner was not on, there were valuables in plain view, and a side door was slightly ajar. (J.A. 483-85) While those facts may have given the officers a hunch that someone might be living in the van, they did not give rise to a reasonable belief that there was probably someone in medical distress in the back of the van, and that officers had to immediately enter the van to perform

a welfare check some 90 minutes after they arrived on the scene, without even knocking or calling out first to try to determine if someone was actually inside. The District Court erred by concluding otherwise. This Court should therefore reverse the District Court's ruling denying Mr. Treisman's motion to suppress and remand this case for further proceedings.

II. **The District Court erred by concluding that the warrantless impoundment and inventory search of Mr. Treisman's van was reasonable under the community caretaking exception to the warrant requirement.**

A. Standard of review

As noted, this Court reviews a District Court's findings of fact for clear error, and reviews its legal conclusions *de novo*. *See, e.g.*, *McKenzie-Gude*, 671 F.3d at 458. "*De novo* review is [also] preferred for determinations of whether a search or seizure violates the Fourth Amendment." *Gwinn*, 219 F.3d at 332.

B. Vehicle searches and seizures based on community caretaking

As with any other type of search or seizure, the search or seizure of a vehicle without a warrant is "*per se* unreasonable under the Fourth Amendment – subject only to a few specifically established and well delineated exceptions." *Minnesota v. Dickerson*, 508 U.S. 366, 372 (1993) (quotation omitted).

One exception to the warrant requirement is the community caretaking exception, as discussed above. Officers may sometimes rely on the community caretaking exception to tow or impound a vehicle and inventory its contents. *See*

24

*generally South Dakota v. Opperman*, 428 U.S. 364, 368-69 (1976). For example, police may lawfully take custody of vehicles that have been damaged or disabled, or which are parked illegally and blocking traffic. *See id.* If police lawfully seize a vehicle, they may inventory the vehicle's contents to protect the owner's property while it is in police custody, and also to protect the police against claims of lost or stolen property. *See id* at 369.

"[T]he authority to impound a car is susceptible to abuse. For example, the police might impound a car as a pretext to search for evidence of a crime." *United States v. Woodard*, 5 F.4th 1148, 1150 (10th Cir. 2021) (citation omitted). For that reason, three things must be true in order for a vehicle seizure and inventory search to be reasonable for Fourth-Amendment purposes. First, police must have lawfully taken custody of the vehicle. Second, the inventory must be conducted pursuant to standard police procedures. Third, the seizure and inventory search cannot be a pretext for gathering incriminating evidence from the vehicle. *See, e.g.*, *United States v. Brown*, 787 F.2d 929, 931-32 (4th Cir.), *cert. denied*, 479 U.S. 837 (1986).

C.    The impoundment and inventory search here did not meet the criteria for reasonable police action under the community caretaking exception

1.    *The officers did not have lawful custody of the van.*

The officers' purported authority to impound Mr. Treisman's van came from a variety of sources, including Kannapolis Police Department General Order 900-02

(J.A. 579) and the Kannapolis Code of Ordinances, Sections 10-231 *et seq*. (J.A. 588)

Under the city code, an abandoned vehicle is defined as one that is left on private property without the occupant's consent for longer than two hours. *See* Code § 10-232(4). The code gives the police department and the city zoning administrator shared responsibility for the removal and disposition of abandoned vehicles: the police are responsible for abandoned vehicles on public property, while the zoning administrator is responsible for those on private property. *See* Code § 10-231. No matter the location, an abandoned vehicle may only be towed after notice has been affixed to the windshield for seven days. *See* Code § 10-236(a). Notice may be waived if necessary to protect public safety and welfare. *See* Code § 10-238. In order for notice to be waived, however, the appropriate authorizing official must make the determination that the waiver is necessary. *See* Code § 238(2). For vehicles abandoned on private property, the authorizing official who makes that determination is the city zoning administrator. *See* Code § 232. (J.A. 588-92)

KPD General Order 900-02 is substantially similar to the city code. It defines "abandoned vehicle" in the same way. *See* Order 900-02 (Definition 1). It also provides that police are responsible for removing abandoned vehicles on public streets, while the city zoning administrator is responsible for abandoned vehicles on private property. *See* Order 900-02(F)(1)(a)-(b). In fact, the order specifically

26

directs that any complaints regarding abandoned vehicles on private property should be referred to the city zoning administrator. *See* Order 900-02(G)(2). The order also requires seven days' notice for removal of an abandoned vehicle. *See* Order 900-02(F)(2). As with the city code, notice may be waived to protect public safety and welfare; but, unlike the city code, the order does not indicate who is responsible for making that determination. *See* Order 900-02(F)(3). The order also indicates that police will not generally tow a vehicle from private property if the occupant could have it towed without police assistance, *see* Order 900-02(F)(1), and that police will not tow a vehicle from private property in any event without first receiving a written request and indemnification from the occupant. *See* Order 900-02(F)(3). (J.A. 579-84)

The KPD policy manual indicates that its orders are guidelines that do not account for all possible circumstances and situations. (J.A. 587) However, the manual does specifically indicate that if any of its orders conflict with a city, state, or federal law, the higher authority controls. (J.A. 587)

The officers here did not comply with the KPD General Order or the Kannapolis Code of Ordinances. Both the police order and the code provide that it is the city zoning administrator, rather than the police department, that is responsible for the removal and disposition of abandoned vehicles on private property. In addition, although the police order does not specify the official who determines

27

whether waiving the required seven-day notice is necessary for public safety, the code – which is a higher legal authority – specifies that it is also the zoning administrator, rather than the police.

Yet, the officers in this case never contacted the city zoning administrator. (J.A. 346) Captain Smith testified that he did not contact the zoning administrator because that department usually handled disabled, nuisance, or junked vehicles, whereas the van in question was full of property and weapons. (J.A. 314-15) His understanding was incorrect, as the police order and code both gave the zoning administrator authority over abandoned vehicles such as Mr. Treisman's van, regardless of the property it contained.  Captain Smith also testified that he believed that if he had called the zoning administrator, they would have requested police assistance anyway, based on the weapons in the van. (J.A. 315) Regardless of whether that would have happened, however, the police orders and code did not authorize Captain Smith to skip that step.

Perhaps more importantly, Captain Smith did not have the authority to waive the notice requirement in place of the zoning administrator, and there was no evidence that the zoning administrator would have – or could have – delegated that decision to police.  Captain Smith testified that although the zoning administrator had to provide seven days' notice to tow an abandoned vehicle, police were not required to provide any notice when removing a vehicle from private property. (J.A.

337-38) That position was flatly inconsistent with both the police orders and the code.[7]

Because the officers did not follow the necessary procedure for removing the van from the bank parking lot, they did not have lawful custody of the van prior to conducting the inventory search. *See, e.g.*, *North Carolina v. Phifer*, 254 S.E.2d 586 (N.C. 1979) (holding that police did not lawfully impound a vehicle because they failed to get authorization from the necessary authority as specified under the portion of the city code that controlled the towing of impounded vehicles).

    2.    *The officers did not conduct the inventory search pursuant to standard criteria and procedures.*

For an inventory search to be valid and reasonable, it "must have been conducted according to standardized criteria, such as a uniform police department policy." *United States v. Matthews*, 591 F.3d 230, 235 (4th Cir. 2009) (cleaned up), *cert. denied*, 562 U.S. 995 (2010).

An inventory policy may allow police to exercise some amount of discretion when conducting an inventory search, "so long as that discretion is exercised

---

[7] The District Court noted at the suppression hearing that N.C. Gen. Stat. §§ 20-137.9 and -137.10 also required police to give notice before towing an abandoned vehicle from private property, but the statute did not contain any exception to the notice requirement. The Court asked the Government how the city code could authorize a waiver of notice where the higher-authority statute did not authorize such a waiver. The Government responded that it did not know the answer, and was not sure how North Carolina state courts would answer that question. (J.A. 410-12)

according to standard criteria." *Colorado v. Bertine*, 479 U.S. 367, 375 (1987).  In *Bertine*, for example, the Supreme Court considered a police regulation that gave officers discretion to either impound and inventory a vehicle if the driver had been arrested, or instead leave it locked in a public parking lot.  The Court found that the grant of discretion to the officers was permissible because the officers had to make the towing decision in light of standardized criteria related to the feasibility and appropriateness of leaving the vehicle parked and locked.  *See id.* at 375-76; *see also, e.g.*, *Matthews*, 591 F.3d at 238-39 (although a police policy gave officers discretion to decide whether to open and inventory sealed containers in a vehicle, that discretion was sufficiently limited by other directives about where and how the officers were required to search the vehicle).

In this case, KPD General Order 900-02(C) provided standardized criteria for how officers were to conduct inventory searches, including the areas that officers were permitted to search and the documentation they had to be generate from the search. (J.A. 581-82) However, the order gives officers unrestricted discretion to determine whether to conduct an inventory search in the first place.  Specifically, Order 900-02(C) provides that officers "may" conduct a warrantless inventory search once a vehicle has been lawfully impounded. (J.A. 581) The order provides no criteria to guide or inform the officer's determination about whether to perform

the inventory search; therefore, it is not possible for an officer to exercise that discretion "according to standard criteria" in the orders. *Bertine*, 479 U.S. at 375.

        3.    *The inventory search was pretextual.*

"Since an inventory search may be undertaken without a warrant or probable cause, it is potentially subject to abuse by police officers intent upon ferreting out evidence of criminal activity." *Phifer*, 254 S.E.2d at 588. If the totality of the circumstances show that an officer's "stated reasons for the search were pretextual, the community-caretaking exception would not apply." *United States v. Johnson*, 410 F.3d 137, 145 (4th Cir.), *cert. denied*, 546 U.S. 952 (2005).

In this case, there were myriad factors demonstrating that the officers' purported justification for the inventory search was a pretext to uncover evidence of possible criminal activity. These factors included:

(1) The van was parked in a marked parking space, and was not obstructing bank traffic. There were no signs indicating that the van was not permitted to park in the lot or that it would be subject to towing.

(2) The van was "on private property, where public safety and convenience are less likely to be at risk." *Woodard*, 5 F.4th at 1155 (cleaned up) (finding that this factor was evidence of pretext).

(3) The officers engaged in a pattern of conduct demonstrating that they were intent on finding a way to search the van, including by manufacturing an "urgent

necessity" justification that was not supported by the circumstances, as discussed in Part I above. *See United States v. Turnbow*, 812 Fed. Appx. 632, 633 (9th Cir. 2020) (unpublished) (evidence of pretext where officer "took numerous steps to justify searching [the vehicle] until he finally settled on an inventory search," and he "only relied on the inventory search exception once it was clear that there was no other available means to satisfy the Fourth Amendment requirement").

(4) The officers skipped administrative steps under their operating procedure and city code in order to perform the inventory search without permission from the appropriate supervising official. *See, e.g.*, *Phifer*, 254 S.E.2d at 223 (holding that the officers' unilateral determination to have a car towed and inventoried without first seeking authorization from the appropriate official was evidence of pretext).

(5) The inventory search was "more intrusive than necessary to accomplish its purpose." *Johnson*, 410 F.3d at 146. Specifically, as the officers removed closed firearm cases from the back of the van, they opened the cases and ran the serial numbers to determine whether the firearms were stolen. The officers' purported justification for this was that in order to return the firearms to the owner at some point in the future, they would first have to determine if the guns were stolen. (J.A. 340) However, those additional searches by their very nature were designed to uncover evidence of crime. KPD General Order 900-02(C) did not direct the officers to run the serial numbers of any firearms located during the inventory, and there was

32

no reason that those searches could not have been performed when the owner later tried to retrieve the firearms from police custody. By performing those searches on the scene, officers ensured that they would have immediate access to the van for criminal investigative purposes in the event that any of the firearms were discovered to be stolen.

(6) The officers' written inventory did not list any of the individual firearms located during the inventory search; rather, it just noted that "FIREARMS" were taken from the van. (J.A. 578) *See Sansbury v. Indiana*, 96 N.E.3d 587, 593 (Ind. App. 2017) (noting that an officer's failure to produce a written inventory "disserved two of the purposes of inventory searches: protection of private property in police custody and protection of police against claims of lost or stolen property").

In addition, there were multiple alternatives available to police rather than impounding the van and conducting an inventory search. To begin, even though the front cabin was locked, the officers could have used an unlocking mechanism to open the cabin, move the Days Inn parking pass, and read the VIN on the dashboard. (J.A. 413) *See New York v. Class*, 475 U.S. 106 (1986) (holding that officers may intrude into a vehicle to read a VIN that was otherwise obscured). The officers then could have used that information to continue to search for the registered owner prior to impounding and searching the van.

The officers also could have used an unlocking mechanism to retrieve the firearms in plain view in the front cabin and keep them for safekeeping, and then re-secure the van so that it could be left in the parking lot or towed privately after the appropriate notice was given. (J.A. 456-58) Although Officer Wagner did not think the side doors could be locked (J.A. 266-67), Officer Lambert was not sure whether securing the van was possible (J.A. 210), and it is not clear that the officers ever made more than a cursory effort to secure the van after conducting the initial welfare check. Rather, they simply left the doors open.

If the officers did not want to attempt to secure the van, they could have just waited for an additional, reasonable amount of time to see if the owner came back for the van, or if any of their phone calls to possible owners were returned. In *Cady*, for example, the Supreme Court noted that if police were concerned about a public-safety threat based on a weapon in a vehicle, they might post a police guard at the vehicle until the owner could take possession of the vehicle or the situation could otherwise be resolved. *See Cady*, 413 U.S. at 447.

The officers also could have easily complied with the proper impoundment procedures in their policy orders and the city code, and contacted the city zoning administrator to inform them of the situation and have them make the decision about whether to tow the van, how to tow the van, and whether notice of the impoundment should be waived. In fact, given that Mr. Treisman returned to the bank shortly after

34

officers towed the van, it is highly likely that if the officers had followed the correct procedure, Mr. Treisman would have retrieved his van prior to it being lawfully towed or inventoried.

In sum, the officers' decision to impound and search Mr. Treisman's van did not meet the criteria for a valid community-caretaking function. The officers did not comply with internal and local regulations regarding the impoundment process, and thus did not have lawful custody of the van. They then inventoried the van based on a police regulation that gave them unfettered discretion to determine whether to conduct the inventory search. Further, based on the totality of the circumstances, it was apparent that the officers were looking for any possible means to search the van, and that the inventory search was a pretext for officers to try to uncover evidence of possible criminal activity. For these reasons, the community caretaking exception to the warrant requirement did not apply, and the officers' impoundment and search of the van were unreasonable under the Fourth Amendment. The District Court erred by concluding otherwise. This Court should therefore reverse the District Court's ruling denying Mr. Treisman's motion to suppress and remand this case for further proceedings.

35

## <u>CONCLUSION</u>

For the foregoing reasons, Mr. Treisman respectfully requests that this Court reverse the District Court's order denying his motion to suppress, vacate the judgments against him, and remand this case for further proceedings.

## **REQUEST FOR ORAL ARGUMENT**

Mr. Treisman believes that oral argument would aid the deliberative process in this appeal and respectfully requests that this Court grant oral argument.

Respectfully submitted this 21st day of July, 2022.

DANIEL M. BLAU,
ATTORNEY AT LAW, PC

/s/ *Daniel M. Blau*
Daniel M. Blau
N.C. State Bar No. 36632
Attorney for Defendant-Appellant
887A Washington Street
Raleigh, N.C. 27605
Telephone: (919) 256-3606
Email: dan@danblau.law

## <u>CERTIFICATE OF COMPLIANCE</u>

1.    This brief complies with type-volume limits because, excluding the parts of the document exempted by Fed. R. App. P. 32(f) (cover page, disclosure statement, table of contents, table of citations, statement regarding oral argument, signature block, certificates of counsel, addendum, attachments):

[ X ] this brief contains [*8,259*] words.

[  ] this brief uses a monospaced type and contains [*state the number of*] lines of text.

2.    This brief complies with the typeface and type style requirements because:

[ X ] this brief has been prepared in a proportionally spaced typeface using [*Microsoft Word 365*] in [*14pt Times New Roman*]; *or*

[  ] this brief has been prepared in a monospaced typeface using [*state name and version of word processing program*] with [*state number of characters per inch and name of type style*].

Dated:  <u>July 21, 2022</u>        <u>/s/ Daniel M. Blau</u>
                                      *Counsel for Appellant*

## <u>CERTIFICATE OF FILING AND SERVICE</u>

I hereby certify that on this 21st day of July, 2022, I caused this Brief of Appellant and Joint Appendix to be filed electronically with the Clerk of the Court using the CM/ECF System, which will send notice of such filing to the following registered CM/ECF users:

> Graham T. Green
> Craig M. Principe
> OFFICE OF THE U.S. ATTORNEY
> 251 North Main Street, Suite 726
> Winston-Salem, North Carolina  27101
> (336) 631-5268
>
> *Counsel for Appellee*

I further certify that on this 21st day of July, 2022, I caused a copy of the Sealed Volume of the Joint Appendix to be served, via UPS Ground Transportation, upon counsel for the Appellee, at the above address.

/s/ Daniel M. Blau
*Counsel for Appellant*