In the

# UNITED STATES COURT OF APPEALS

### For the Fourth Circuit

_____

**No. 21-4687**

_____

### UNITED STATES OF AMERICA,

Appellee,

v.

### ALEXANDER HILLEL TREISMAN,
### a/k/a Alexander S. Theiss,

Appellant.

_____

**On Appeal from the United States District Court
For the Middle District of North Carolina**

_____

## <u>BRIEF FOR APPELLEE</u>

**SANDRA J. HAIRSTON**
**United States Attorney**

**Graham T. Green**
**Craig M. Principe**
**Assistant United States Attorneys**

**251 N. Main St., Ste. 726**
**Winston-Salem, NC 27101**
**(336) 333-5351**

**Attorneys for Appellee**
**Date: October 11, 2022**

TABLE OF CONTENTS

BRIEF FOR APPELLEE ........................................................................ 1

STATEMENT OF JURISDICTION......................................................... 1

ISSUES PRESENTED.............................................................................. 2

I.    WHETHER POLICE OFFICERS' DECISION TO OPEN THE
      SIDE DOOR OF A VAN WHOSE OWNER COULD NOT BE
      IDENTIFIED AND LOCATED, IN ORDER TO CONDUCT A
      WELLNESS CHECK, WAS LAWFUL PURSUANT TO THE
      COMMUNITY CARETAKING DOCTRINE?................................. 2

II.   WHETHER POLICE OFFICERS' ACTIONS WERE
      REASONABLE WHEN THEY DECIDED TO TOW TREISMAN'S
      VAN, AFTER BEING REQUESTED TO DO SO BY THE FIFTH
      THIRD BANK, AND THEN INVENTORIED THE CONTENTS OF
      THE VAN WITHOUT AN INVESTIGATIVE PURPOSE?............. 2

STATEMENT OF THE CASE ................................................................. 2

STATEMENT OF THE FACTS ............................................................. 4

SUMMARY OF ARGUMENT ............................................................. 18

ARGUMENT ......................................................................................... 19

I.    POLICE OFFICERS' DECISION TO OPEN THE SIDE DOOR OF
      A VAN WHOSE OWNER COULD NOT BE IDENTIFIED AND
      LOCATED, IN ORDER TO CONDUCT A WELLNESS CHECK,
      WAS LAWFUL PURSUANT TO THE COMMUNITY
      CARETAKING DOCTRINE. ......................................................... 19

      A.   Standard of Review .............................................................. 19

      B.   Discussion ............................................................................. 19

II.   POLICE OFFICERS WERE JUSTIFIED IN TOWING
      TREISMAN'S VAN WHEN REQUESTED TO DO SO BY THE
      FIFTH THIRD BANK AND PROPERLY INVENTORIED THE
      CONTENTS TO PROTECT THE OWNER'S PROPERTY FROM
      LOSS AND TO ADDRESS THE INHERENT DANGER TO
      PUBLIC SAFETY PRESENTED BY THE CONTENTS. ............. 24

      A.   Standard of Review .............................................................. 24

      B.   Discussion ............................................................................. 24

CONCLUSION ........................................................................ 33

CERTIFICATE OF COMPLIANCE ...................................... 34

CERTIFICATE OF SERVICE

TABLE OF AUTHORITIES

**Cases**

*Allen v. Johnson,*
  396 F. App'x 46 (4th Cir. 2010) ............................................................ 29
*Cabbler v. Superintendent, Virginia State Penitentiary,*
  528 F.2d 1142 (4th Cir. 1975) ............................................................ 26
*Cady v. Dombrowski,*
  413 U.S. 433 (1973) ............................................................ 20, 24
*Colorado v. Bertine,*
  479 U.S. 375 (1987) ............................................................ 25
*Coolidge v. New Hampshire,*
  403 U.S. 443 (1971) ............................................................ 22
*Durney v. Doss,*
  106 F. App'x 166 (4th Cir. 2004) ............................................................ 21
*Herring v. United States,*
  555 U.S. 135 (2009) ............................................................ 31
*Hudson v. Michigan,*
  547 U.S. 586 (2006) ............................................................ 31
*Muth v. United States,*
  1 F.3d 246 (4th Cir. 1993) ............................................................ 29, 30
*Sawyer v. Whitley,*
  505 U.S. 333 (1992) ............................................................ 29
*South Dakota v. Opperman,*
  428 U.S. 364 (1976) ............................................................ 21, 22, 28
*United States v. Brown,*
  787 F.2d 929 (4th Cir. 1986) ............................................................ 26
*United States v. Bullette,*
  854 F.3d 261 (4th Cir. 2017) ............................................................ 25, 29
*United States v. Cartrette,*
  502 F. App'x 311 (4th Cir. 2012) ............................................................ 25
*United States v. Clyburn,*
  24 F.3d 613 (4th Cir. 1994) ............................................................ 31
*United States v. Cobb,*
  970 F.3d 319 (4th Cir. 2020) ............................................................ 30
*United States v. Coccia,*
  446 F.3d 233 (1st Cir. 2006) ............................................................ 26

*United States v. Dyess,*
  730 F.3d 354 (4th Cir. 2013) ...................................................... 30
*United States v. Edwards,*
  666 F.3d 877 (4th Cir. 2011) ...................................................... 30
*United States v. Fort,*
  313 F. App'x 665 (2009) ...................................................... 25, 26
*United States v. Gwinn,*
  219 F.3d 326 (4th Cir. 2000) ...................................................... 22
*United States v. Herrera-Pagoada,*
  14 F.4th 311 (4th Cir. 2021) ...................................................... 30
*United States v. Johnson,*
  410 F. 3d 137 (4th Cir. 2005) ............................................ 20, 21, 22
*United States v. Lewis,*
  606 F.3d 193 (4th Cir. 2010) ................................................. 19, 24
*United States v. Medford,*
  661 F.3d 746 (4th Cir. 2011) ...................................................... 30
*United States v. Palmer,*
  820 F.3d 640 (4th Cir. 2016) ................................................. 19, 24
*United States v. Powers,*
  439 F.2d 373 (4th Cir. 1971) ...................................................... 21
*United States v. Proctor,*
  489 F.3d 1348 (D.C. Cir. 2007) .................................................. 26
*United States v. Ray,*
  201 F.3d 438 (4th Cir. 1999) ...................................................... 30
*United States v. Rodriguez-Morales,*
  929 F.2d 780 (1st Cir. 1991) ................................................. 21, 25
*United States v. Smith,*
  522 F.3d 405 (3rd Cir. 2008) ...................................................... 26

## **Statutes**

18 U.S.C. § 2252A(a)(1) .................................................................. 3
18 U.S.C. § 2252A(a)(5)(B) ......................................................... 2, 3
18 U.S.C. § 3231 ........................................................................... 2
18 U.S.C. § 3742 ........................................................................... 2
28 U.S.C. § 1291 ........................................................................... 2

In the

UNITED STATES COURT OF APPEALS

For the Fourth Circuit

_____

_____

No. 21-4687

_____

UNITED STATES OF AMERICA,

Appellee,

v.

ALEXANDER HILLEL TREISMAN,

a/k/a Alexander S. Theiss,

Appellant.

_____

On Appeal from the United States District Court
For the Middle District of North Carolina

_____

**BRIEF FOR APPELLEE**

**STATEMENT OF JURISDICTION**

This case is a direct appeal by the defendant, Alexander Hillel
Treisman, following a final amended judgment entered April 13, 2022 in
the United States District Court for the Middle District of North

Carolina.  JA 12, JA 558-565.  The district court had original jurisdiction

over the case, pursuant to 18 U.S.C. § 3231.  Treisman filed his notice of

appeal on April 28, 2022.[1] JA 566. This Court has appellate jurisdiction,

pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3742.

## ISSUES PRESENTED

**I.  WHETHER POLICE OFFICERS' DECISION TO OPEN THE SIDE DOOR OF A VAN WHOSE OWNER COULD NOT BE IDENTIFIED AND LOCATED, IN ORDER TO CONDUCT A WELLNESS CHECK, WAS LAWFUL PURSUANT TO THE COMMUNITY CARETAKING DOCTRINE?**

**II.  WHETHER POLICE OFFICERS' ACTIONS WERE REASONABLE WHEN THEY DECIDED TO TOW TREISMAN'S VAN, AFTER BEING REQUESTED TO DO SO BY THE FIFTH THIRD BANK, AND THEN INVENTORIED THE CONTENTS OF THE VAN WITHOUT AN INVESTIGATIVE PURPOSE?**

## STATEMENT OF THE CASE

Defendant Treisman was initially charged by complaint on June 4,

2020. JA 2. A grand jury issued an indictment against Treisman on June

22, 2020 charging a violation of 18 U.S.C. § 2252A(a)(5)(B) and (b)(2),

---

[1] Prior to the restitution hearing and Amended Judgment of the district court, the court had entered an initial Judgment on November 30, 2021, JA 542-549, and the defendant filed an initial Notice of Appeal on December 14, 2021, JA 550.

possession of child pornography. JA 14-15. A grand jury issued a superseding indictment against Treisman on September 22, 2020 charging three counts: a violation of 18 U.S.C. § 2252A(a)(5)(B) and (b)(2), possession of child pornography, and two counts alleging violation of 18 U.S.C. § 2252A(a)(1) and (b)(1), transportation of child pornography in interstate commerce. JA 16-18.

The defendant filed a motion to suppress evidence on January 13, 2021. JA 5, JA 19-27. A hearing was held on February 22, 25, and 26, 2021. JA 6. The district court denied Defendant's motion to suppress by oral order on February 26, 2021. JA 6, JA 436-513. The court filed a written Notice of Additional Findings on March 2, 2021. JA 6-7, JA 515-518.

A sentencing hearing was held on September 22, 2021 and October 12, 2021 and the defendant was sentenced by the court. JA 8. A written judgment was entered on November 30, 2021. JA 9, JA 542-549. An initial Notice of Appeal was filed. JA 68, JA 550. A restitution hearing was held on February 11, 2022. JA 9. An amended judgment was filed on April 14, 2022. JA 12, JA 558-565. A second Notice of Appeal was filed on April 28, 2022. JA 13, JA 566.

3

## STATEMENT OF THE FACTS

**A.    Testimony from the suppression hearing.**

On May 28, 2020, police officers with the Kannapolis Police Department ("KPD") responded to a call for service at the Kannapolis branch of the Fifth Third Bank, located at 606 S. Main Street, Kannapolis, North Carolina in Cabarrus County. JA 126, JA 270. A bank employee had contacted KPD about two vehicles that had apparently been left in the bank parking lot. JA 126. The owners were not present. One vehicle, a white Ford van with an expired California tag, had been left in the bank's parking lot since the day prior. JA 124, JA 274. KPD officers, Wagner and Lambert, observed through the front windows of the Ford van that there was an assault rifle leaning against the back of a front seat. JA 194-195, JA 273. The rifle had a scope and an extended magazine. JA 194-195, JA 273.



JA 572. [2]

The officers also saw a box for a Taurus .380 handgun, a box of 5.56mm ammunition, a large plastic container of Tannerite,[3] and unknown pills in the front passenger area of the van. JA 194-195, JA 273.

_____

[2] This photograph and subsequent photograph in this brief are color copies of the Government Exhibits that were introduced at the suppression hearing and are located in the Joint Appendix, produced as black and white photocopies.
[3] Tannerite is often used by target shooters because it produces an explosion and smoke when hit by a bullet. It can cause injury. Tannerite can be bought in stores and is legal to possess. JA 196-198, JA 299-300.



JA 574.[4]

KPD officers ran the license plate information for the tag affixed to the van but were unable to obtain information about a registered owner. JA 205, JA 272. Additionally, they were not able to confirm if the Vehicle Identification Number ("VIN") for the vehicle associated with what

---

[4] This photo shows the container of unmixed Tannerite from the front of Treisman's van. The Tannerite was observed by a KPD officer through the windows of the van in the van's front passenger compartment, however, this photo was taken later during the execution of the state search warrant. JA 202-203.

appeared to be an expired license plate actually matched the van's VIN since the VIN was covered by hotel paperwork and therefore could not be seen from outside the van. JA 195, JA 275. The officers made multiple attempts throughout their interaction with the van to identify and contact the owner. JA 217, JA 312, JA 333.



JA 573.

Officers asked the bank employee whether the bank's video surveillance might show anyone associated with the van. JA 209, JA 276-

---

[5] This photo shows the location of the Holiday Inn paperwork obscuring the van's VIN from the KPD officer's view. The photo was taken during the execution of the state search warrant for the van.

277. The officers learned that there was not any video surveillance footage of that part of the parking lot. JA 209, JA 276-277.



JA 570.

The van did not have windows in the back making it impossible to see if there was anyone in the back of the van. JA 200. The van had an A/C unit on top of it suggesting that it could be occupied. JA 198. Further, officers noticed a suitcase in the front passenger area suggesting, based on prior experience, that someone might be living in the van. JA 280-281. The officers noted that the AC unit top of the van was not running. JA 198, JA 281. The officers on scene noted that it was a "pretty warm" or "extremely hot" day. JA 206, JA 281.

Based on the items observed in the front passenger area of the van, the condition of the van, and the length of time that the van had

apparently been left unattended in the parking lot, KPD officers decided to check the rear of the van to see if anyone needed assistance in the van. JA 207-208, JA 237-238, JA 280-281. The front and rear doors were locked, but the van's side door was unlocked, and one KPD officer noted it appeared the side doors were ajar, as if the doors had not been shut all the way. JA 194, JA 207, JA 279, JA 297. KPD officers tried the rear door and were surprised when it swung open. JA 263. They looked in the rear cabin and saw additional gun cases, but found no one inside the van. JA 207-209.



JA 575.

Once the officers determined that the van's rear area was unsecured and that there were possibly other firearms present, they became concerned that there was now a public safety issue with the

9

abandoned vehicle and its contents. JA 210-211, JA 243, JA 306, JA 333-335. Officers determined that the locking mechanism on the side door of the van was not functional, and the door could not be locked. JA 266-288. Among the officers on scene there was a general acknowledgment as to the need for safekeeping what appeared to be valuable items for the unidentifiable owner. JA 333-335. Officers stood by the van but did not search it while they determined what to do next. JA 210-211. KPD officers then spoke with the bank manager, Crystal Wright, who requested that the van be towed from the parking lot. JA 210-211.

KPD officers consulted a supervisor and determined that the KPD tow policy would authorize towing the vehicle from a private lot with the property owner's consent, where there were firearms in the vehicle. JA 314-315, JA 329-332. That supervisor testified that under the KPD policy that police could be involved with the towing of a vehicle from a private lot where it was both abandoned and could not be towed "without police assistance." JA 329-330; JA 583-584. Since the van was on the bank's private property, KPD officers, pursuant to department policy, waited until the bank manager signed a Property Owner Tow Request. JA 137-138, JA 282-284, JA 569, JA 584.

The KPD contacted a tow company to tow the van. JA 216, JA 337. KPD officers determined that a tow company would not tow the vehicle without police assistance in securing the firearms. JA 357. The on-call tow company representative confirmed that they would not tow a vehicle without police assistance in securing the firearms. JA 163-164. KPD officers, consistent with their policy, began making an inventory of valuable items inside the van prior to it being towed. JA 216, JA 337.

During the inventory search of the van, officers found several firearms, books about survival, bomb making, improvised weapons, and Islam, numerous electronic devices, a drone, and a large amount of cash banded and sealed in bank bags, estimated to be several hundred thousand dollars.[6] The discovery of these items caused the KPD to believe that the owner of the van was involved in some form of criminal activity. JA 293, JA 339. Officers eventually decided to obtain a search warrant for the van based on the nature of its contents as seen during the

_____

[6] Treisman later told federal officers with the Joint Terrorism Task Force that the cash was his inheritance from his father. FBI agents confirmed through Treisman's mother that he received a sizable inheritance. FBI agents spoke with employees of a bank in Long Beach, California and confirmed Treisman withdrew the money in cash on or about January 10, 2020. JA 613.

inventory search. JA 293, JA 339. Two KPD officers testified about the unique circumstances surrounding the van; one described it as "very unusual" and the other said the situation was "unique in my 20 years [of law enforcement experience]." JA 273, JA 332.

After the van was towed, the bank called the police department to report that Treisman had come to the bank and inquired about his van. When police arrived Treisman was in the drive-thru bank line in his Honda Accord. He was detained and the vehicle was searched. He was found to be in possession of another firearm that was concealed. He was ultimately found to be in possession of a cell phone that contained child pornography. JA 613. Law enforcement subsequently searched multiple electronic devices in both vehicles, finding child pornography. JA 616.

**B.    The district court's finding supporting reasonableness.**

A suppression hearing was held. JA 109. The district court made findings on the record and in a supplemental order. JA 437-513, JA 515-518. The court stated:

> [A]fter hearing the testimony, I find the Government witnesses credible, and adopt that testimony, unless, as explained otherwise hereafter, there are certainly some discrepancies between the testimony of Ms. Wright, Ms. Deal, and the law enforcement officers, as will be explained hereafter with respect to the timing of certain events.

12

> However, as to those matters, I find and adopt the testimony
> of law enforcement.

JA 478.

The district court summarized its reasonableness finding regarding

the wellness check:

> I have no doubt but what the officers reasonably believed that
> the van with an expired California tag parked in a bank
> parking lot overnight with firearms and Tannerite in plain
> view in the front, an unsecure door, and the various other
> facts were all unusual circumstances that caused—that led
> the officers and supported their conclusion that . . . an
> individual might be in need of medical assistance in the back
> of the van, perhaps dead in the back of the van, honestly.

JA 487.

Further, the court concluded:

> [A]fter hearing the evidence, that law enforcement conducted
> the impoundment and inventory of the van in a good faith
> effort—inventory the van in a good faith community
> caretaking function and not for the purpose of detecting,
> investigating, or acquiring evidence relating to the violation
> of a criminal statute. Instead, I find that the officers acted
> pursuant to an inventory search to secure valuables and to
> tow the vehicle—a vehicle and property—improperly left on
> private property at the request of the owner.

JA 478.

As to the court's reasonableness findings, the court made factual

findings. The court found that the police responded to a request for

13

assistance from the bank and found an unoccupied white Ford van that had been left in the parking lot overnight, with an expired California license tag. The van contained an AR-style firearm, Tannerite, and a pistol case visible in the front cabin. JA 479-480. None of the items viewed in the locked front cabin were considered by the officers to be evidence of unlawful conduct, however, they did deem it unusual. JA 480. Furthermore, the van's VIN was obstructed by a hotel receipt. JA 481. The court determined from the testimony that the primary focus of law enforcement was what to do with the van and was not "that crime was afoot or that further investigation was necessary . . . ." JA 482.

The court found that the rifle in the cab was readily accessible to any individual who may be disposed to steal it and that breaking and entering motor vehicles was a particular concern of the Kannapolis Police Department. JA 483. Additionally, the court addressed conversation that transpired among officers on scene about whether someone could be in the back of the van and in distress and the officer's conclusion that a wellness check was necessary. JA 484. The court found that there were "sufficient facts to support a finding that that was an appropriate conclusion to reach." JA 484.

14

Specifically, the court determined the following facts were important: it 1) was a warm day and the van's refrigerator/AC unit was not operating; 2) the combination of a California license plate, the items in the front of the van, including a black suitcase, suggested that someone may be living in the van; 3) the AR-15 was valuable and accessible to anyone willing to break a window, and, 4) that the officers reasonably concluded that since the van's side door was slightly ajar caused concern about warranted a wellness check. JA 485. The court found that it was reasonable that officers drew their weapons, when surprised by the rear door swinging open, and subsequently decided to peer into the interior of the van's rear compartment for officer safety purposes and to conduct a wellness check of persons who may be in the van. JA 486.

The court recognized that the officers were faced with "strange and unknown circumstances" and found that their actions were "not a subterfuge or pretext for conducting a criminal investigation, nor . . . indicative that officers were conducting a search for evidence in connection with a possible criminal offense." JA 488. Indeed, the officers did not otherwise enter the van or search the van, but stopped and waited outside the van for a final decision on whether the bank or the police

would tow the vehicle. JA 489. The officers also reasonably concluded that there may be additional unsecured firearms in the rear compartment of the van, having observed hard and soft gun cases during their initial view of the compartment during the wellness check. JA 489-490.

The court then turned its analysis to the later inventory of the van. JA 492. The court found that no officer removed any items from the van prior to the inventory. JA 492. The court noted that the inventory of the van was done with a purpose of "looking for valuable items to protect," and that officer's noted that "valuable items can be small and found in unusual places." JA 493. The court concluded that ". . . although I believe the search was thorough, I do not find it unreasonable or a violation of the inventory search requirements." JA 493. After listening to testimony and watching body worn camera video, the court noted that as the inventory progressed the nature of documenting and handling the items in the van was consistent with an inventory search and not indicative of a process focused on developing and documenting evidence of a criminal investigation. JA 494-495.

The court found that KPD acted in accordance with Kannapolis City Code and police regulations in accepting responsibility for towing the van from private property and further found that "the inventory search was, in fact, an inventory search, and not a pretext for a criminal investigative search." JA 495-496, JA 505-506. In explaining the court's reasoning, the court found that the KPD "policy is imminently reasonable," JA 498. The court also concluded that "the towing was proper under the Kannapolis ordinances," since police assistance was needed to remove the vehicle from private property and that the presence of unsecured firearms in an abandoned vehicle on the bank's property presented a "special need to protect the public safety and welfare as recognized by the Kannapolis City Code." JA 508, JA 515-518. Finally, the court found that once the vehicle was lawfully in police custody, the inventory search was conducted legally and according to police policy, and that the "evidence in the record was overwhelming that the police did not have an investigatory motive for their inventory of defendant's car." JA 508-509.

Regarding the officers' conduct, the court stated:

Those law enforcement officers, particularly Wagner and Lambert, did their best to proceed deliberately and thoughtfully with respect to each step in terms of both protecting whatever rights the owner of that van may possess,

> while, at the same time, discharging their responsibilities as law enforcement officers in Kannapolis who have a duty to protect the safety of the public.

JA 510.

## SUMMARY OF ARGUMENT

The district court did not err when it found that officers acting in good faith and within the community caretaking exception, attempted to determine whether a person was in need of assistance in the rear of a van whose owner could not be located. Under the totality of the circumstances including an owner that could not be located, an irregular out of state tag, the presence of weapons in plain view, a suitcase, a rear door that was slightly ajar, a warm day, and an air conditioning unit that was not running, the district court correctly determined that the officers had acted reasonably.

Furthermore, the district court did not err in determining that once officers became aware of the likely presence of additional weapons in the rear of the cargo van, the officers acted within their policy, in good faith, reasonably and without a criminal investigatory purpose, when they determined that they would assist with the impoundment and towing of the van. Therefore, the subsequent inventory was reasonable and

conducted in an appropriate manner and thus lawful. Following the inventory, subsequent events lead to the seizure of Treisman's electronic devices containing child pornography.

## ARGUMENT

I. **POLICE OFFICERS' DECISION TO OPEN THE SIDE DOOR OF A VAN WHOSE OWNER COULD NOT BE IDENTIFIED AND LOCATED, IN ORDER TO CONDUCT A WELLNESS CHECK, WAS LAWFUL PURSUANT TO THE COMMUNITY CARETAKING DOCTRINE.**

A.    Standard of Review

In assessing a district court's decision on a motion to suppress, this Court reviews factual findings for clear error and legal determinations de novo. *United States v. Lewis*, 606 F.3d 193, 197 (4th Cir. 2010). In so doing, the Court construes the evidence in the light most favorable to the prevailing party, *United States v. Palmer*, 820 F.3d 640, 648 (4th Cir. 2016), and gives "'due weight to inferences drawn from those facts by resident judges and law enforcement officers.'" *Lewis*, 606 F.3d at 197 (citation omitted).

B.    Discussion

As a preliminary matter, it is without controversy in this case that the KPD officers were entitled to examine the items that were in the cab

of the van "in plain view." As noted above, among the items plainly visible to the officers were an assault rifle, ammunition, a box for another firearm, Tannerite, unknown pills, and a suitcase. Furthermore, the van appeared to officers to have a rear side door that was slightly ajar, an A/C unit that was not running on a very warm day, and California tags, suggesting that the owner may have been living in the van.

The Supreme Court has long held that law enforcement officers may exercise "community caretaking functions, totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." *Cady v. Dombrowski*, 413 U.S. 433, 441 (1973). This Court has recognized the need for this community-caretaking exception because police often come into "contact with vehicles for reasons related to the operation of vehicles themselves" and this "often noncriminal contact with automobiles will bring local officials in plain view of evidence, fruits, or instrumentalities of a crime, or contraband." *United States v. Johnson*, 410 F. 3d 137, 144 (4th Cir. 2005) (quoting *Dombrowski* at 441-442).

As courts have noted:

> The policeman plays a rather special role in our society; . . . In addition to being an enforcer of the criminal law, he is a "jack-of-all-emergencies," expected to aid those in distress, combat actual hazards, prevent potential hazards from materializing, and provide an infinite variety of services to preserve and protect the community safety. Recognition of this multifaceted role led to the [Supreme] Court's coinage of the "community caretaking" label in *Cady v. Dombrowski* . . . .

*United States v. Rodriguez-Morales*, 929 F.2d 780, 784-785 (1st Cir. 1991).

Community caretaking functions include established procedures or routine activities such as impounding a vehicle that impedes the safe flow of traffic, entering a car after a traffic accident to assess occupants' medical conditions, or opening a vehicle's trunk compartment to identify the owner. *See South Dakota v. Opperman*, 428 U.S. 364, 368-69 (1976); *Johnson*, 410 F.3d 137, 145 (4th Cir. 2005); *Durney v. Doss*, 106 F. App'x 166, 169 (4th Cir. 2004) (unpublished). In *United States v. Powers*, 439 F.2d 373 (4th Cir. 1971), a case that preceded *Cady*, the Fourth Circuit permitted a law enforcement officer, who had "a legitimate ground for checking the identification number" to open the door of a car without a search warrant in order to look for a VIN. *Id.* at 376. The community caretaking exception may not be used as pretext or executed in bad faith.

*United States v. Gwinn*, 219 F.3d 326, 335 (4th Cir. 2000) (finding that officer's reentry into suspect's home to obtain suspect's shoes and shirt was not a Fourth Amendment violation). Additionally, the community caretaking exception "is not limited to the least intrusive means of protecting the public." *Johnson*, 410 F.3d at 146.

The Supreme Court has held that the standard for an officer's use of the community caretaking exception is reasonableness. It has explained:

> [T]he Fourth Amendment does not require that every search be made pursuant to a warrant. It prohibits only "*unreasonable* searches and seizures." The relevant test *is not the reasonableness of the opportunity to procure a warrant,* but the reasonableness of the seizure under all the circumstances. The test of reasonableness cannot be fixed by *per se* rules; each case must be decided on its own facts.

*Opperman*, 428 U.S. at 373 (1976) (quoting *Coolidge v. New Hampshire*, 403 U.S. 443, 509-10 (1971) (J. Black, concurring and dissenting) (emphasis added)).

In this matter, officers were called to the scene by a bank employee regarding a vehicle that had been left overnight in their parking lot. The van had a California license plate that appeared expired, and no owner could be linked to the tag through records checks. Further, a parking pass

obscured the vehicle's VIN. Officers checked with bank employees and determined that video surveillance at the bank could not be used to determine the owner of the van and whether the owner was nearby. Officers noted at least one rifle with a scope and high-capacity magazine plainly visible in the cab of the van. They also saw a box for another gun, Tannerite, a box of ammunition, and unidentified pills. Officers examined the van and determined that one door appeared to be slightly ajar and became concerned that there may be someone inside the van, in part because of the A/C unit on top of the van and the suitcase. Further, it was a warm day and the van's A/C unit was not running. Given the totality of the circumstances, officers decided to open the unlocked side door to look inside for any persons. When they did, they saw what appeared to be gun cases but found no one inside.

The decision to open the door to potentially locate the owner or other persons who might need assistance under these circumstances falls squarely within the community caretaking function of police. As found by the district court, the circumstances were unique and given the totality of the circumstances the officers' actions were reasonable.

II.  **POLICE OFFICERS WERE JUSTIFIED IN TOWING TREISMAN'S VAN WHEN REQUESTED TO DO SO BY THE FIFTH THIRD BANK AND PROPERLY INVENTORIED THE CONTENTS TO PROTECT THE OWNER'S PROPERTY FROM LOSS AND TO ADDRESS THE INHERENT DANGER TO PUBLIC SAFETY PRESENTED BY THE CONTENTS.**

    A.  <u>Standard of Review</u>

In assessing a district court's decision on a motion to suppress, this Court reviews factual findings for clear error and legal determinations de novo. *United States v. Lewis*, 606 F.3d 193, 197 (4th Cir. 2010). In so doing, the Court construes the evidence in the light most favorable to the prevailing party, *United States v. Palmer*, 820 F.3d 640, 648 (4th Cir. 2016), and gives "'due weight to inferences drawn from those facts by resident judges and law enforcement officers.'" *Lewis*, 606 F.3d at 197 (citation omitted).

    B.  <u>Discussion</u>

        **1.  Police Impoundment of the Van was Reasonable.**

Like the decision to enter an automobile to determine ownership or check on the welfare of occupants, the Supreme Court has stated that a decision regarding impoundment of a vehicle is a valid "community caretaking" function. *Cady*, 413 U.S. at 441–43. As discussed above, the test for officers exercising the community caretaking function is

*reasonableness*. The police only need to show that they made their decision on the basis of something other than suspicion of criminal activity. *Colorado v. Bertine*, 479 U.S. 375, 371-72 (1987). Furthermore, when police have "solid, noninvestigatory reasons for impounding a car, there is not need for them to show that they followed explicit criteria in deciding to impound, as long as the decision was reasonable." *United States v. Fort*, 313 F. App'x 665, 667 (2009) (unpublished) (quoting *United States v. Rodriguez-Morales*, 929 F.2d 780, 787 (1st Cir. 1991)).

As this Court has noted:

> [W]hile [the Supreme] Court has been consistent in holding that inventory searches must be conducted according to standardized criteria, *see Bertine,* 479 U.S. at 374 n. 6, [ ] the [Supreme] Court has afforded police more discretion when it comes to the decision to impound vehicles. The *Bertine* Court stated that "[n]othing in *Opperman* or *Lafayette* prohibits the exercise of police discretion [in the impoundment of vehicles] so long as that discretion is exercised according to standard criteria and on the basis of something other than suspicion of evidence of criminal activity." *Id.* at 375.

*United States v. Cartrette*, 502 F. App'x 311, 315–16 (4th Cir. 2012) (unpublished).

Among the standard criteria courts have endorsed are circumstances where an unattended vehicle can pose a nuisance or a target for theft or vandalism. *See United States v. Bullette*, 854 F.3d 261

25

(4th Cir. 2017) (impoundment constitutes a reasonable course of action when the owner of a vehicle abandons it or law enforcement cannot identify the owner); *United States v. Fort*, 313 F. App'x 665 (4th Cir. 2009) (unpublished) (police officer's decision to have vehicle towed was reasonable and therefore the inventory search was valid after encountering an incapacitated driver and observing in plain view an assault rifle, loaded magazines, ammunition, and police tactical gear); *United States v. Coccia,* 446 F.3d 233 (1st Cir. 2006)[7] (towing of defendant's car from psychiatrist office parking lot was not an unreasonable seizure where vehicle packed with the defendant's belongings was a possible target for theft and police had concerns about whether vehicle contained explosives or biological weapons); *Cabbler v. Superintendent, Virginia State Penitentiary*, 528 F.2d 1142 (4th Cir. 1975) (impoundment and inventory search of a vehicle left in the driveway of a hospital emergency department after driver's arrest); *United States v. Brown*, 787 F.2d 929 (4th Cir. 1986) (police reasonably

---

[7] *But see United States v. Proctor*, 489 F.3d 1348 (D.C. Cir. 2007); *cf. United States v. Smith*, 522 F.3d 405 (3rd Cir. 2008) (following rationale of *Coccia* and declining to follow *Proctor*).

impounded vehicle either because there was no known individual immediately available to take custody of the car, or because the car could have constituted a nuisance in the area in which it was parked).

As noted above, the owner of the van at the Fifth Third Bank could not be identified despite extensive efforts. Further, given the presence of dangerous firearms in plain view, the presence of what was suspected to be additional firearms in the unsecured rear cargo area of the van, the district court did not err when it found the officers on scene had reasonably determined that its contents could become the target of theft. Therefore, the officers' decision to impound and inventory the van protected both the unidentified owner's property and the safety of the community from the danger associated with unattended firearms.

In this case, not only did the KPD choose to impound the van pursuant to long recognized legal criteria, but it also towed the van pursuant to its towing policy. KPD officers operate under a standing order that covers when a vehicle should be towed. JA 579-586. The district court correctly concluded that the responding KPD officers considered the presence of at least one firearm, unknown pills, and a Tannerite in the van, combined with their experience with KPD's towing

27

policy, to determine Treisman's van was not a vehicle that could be removed by the private property owner pursuant to the towing policy *without police assistance*. Further, based upon their experience, this vehicle was not of the type and condition typically referred to the City Zoning Administrator. Once they received a request and authorization from the bank, in the form of a written Property Tow Request, KPD officers correctly determined that they could inventory the vehicle prior to towing it from the bank's property. Considering all these factors, KPD officers acted reasonably by assisting the bank in towing the van from the parking lot following the bank manager's written request for assistance.

### 2.    The Police Inventory of the Van was Reasonable.

Once the decision was made to tow the van, KPD started an inventory of valuable items in the van, also pursuant to KPD policy. JA 581-582. Neither a warrant, nor probable cause is required for an inventory search. *Opperman*, 428 U.S. at 374-76 (1976). An inventory search of a vehicle is properly authorized where "(1) circumstances reasonably justify seizure or impoundment and (2) where law enforcement conducts the inventory search according to routine and

28

standard procedures designed to secure the vehicle or its contents."
*United States v. Bullette*, 854 F.3d 261, 265 (4th Cir. 2017) (internal
citations omitted). As found by the district court, KPD officers' reasonable
and lawful decision to tow the vehicle and the subsequent inventory of
items was made pursuant to policy, was done in good faith, and entirely
appropriate. Further, as found by the district court after reviewing body
camera videos of the inventory, there was nothing inconsistent with an
inventory according to KPD policy. I was only after additional weapons,
books about survival, bomb making, and Islam, a drone, papers, and
approximately $500,000 in U.S. currency were discovered, did KPD
officers stop the inventory and seek a search warrant.

On appeal, Treisman argues for the first time that the Kannapolis
Police policy afforded too much discretion to officers about whether or not
to conduct an inventory. Def. Br. at 30-31. This argument was never
made before the district court. This Court "generally do[es] not consider
new arguments raised for the first time on appeal. *See Sawyer v. Whitley*,
505 U.S. 333, 338-39 (1992); *Murray v. Carrier*, 477 U.S. v. 478, 495-96
(1986); *Muth v. United States*, 1 F.3d 246, 250 (4th Cir. 1993)." *Allen v.
Johnson*, 396 F. App'x 46, 47 (4th Cir. 2010) (unpublished) (parallel

citations removed). Exceptions to this general rule are made only in very limited circumstances, such as where refusal to consider the newly-raised issue would be plain error or would result in a fundamental miscarriage of justice." *Muth*, 1 F.3d at 250. The general rule has been applied by this Court in criminal cases. *United States v. Herrera-Pagoada*, 14 F.4th 311, 318 (4th Cir. 2021); *United States v. Cobb*, 970 F.3d 319, 331-32 (4th Cir. 2020); *United States v. Dyess*, 730 F.3d 354, 365 (4th Cir. 2013); *United States v. Edwards*, 666 F.3d 877, 887 (4th Cir. 2011); *United States v. Medford*, 661 F.3d 746, 754 (4th Cir. 2011); *United States v. Ray*, 201 F.3d 438 (4th Cir. 1999) (per curiam) (unpublished).

Assuming *arguendo* that this Court finds that Kannapolis Police Department officers violated the KPD Policy, the City Code, or even North Carolina General Statutes, that by itself would not warrant suppression by operation of the Fourth Amendment's exclusionary rule, because they acted reasonably under the circumstances. Treisman asks this court to focus on the Kannapolis City Code of Ordinances and the North Carolina General Statutes, particularly their provisions related to who can authorize the towing of a vehicle on private property. Def. Br. at 25-35. However, a preliminary matter, whether Kannapolis Police

Department officers violated the cited provisions does not control the outcome here. Federal, not state law, "governs the admissibility of evidence obtained by state officers but ultimately used in a federal prosecution." *United States v. Clyburn,* 24 F.3d 613, 616 (4th Cir. 1994).

Further, even if the officers were found to have violated of the community caretaking function exception, exclusion of evidence under the exclusionary rule would not be warranted. In *Hudson v. Michigan*, 547 U.S. 586 (2006), the Supreme Court ruled that the exclusionary rule did not apply, noting "[s]uppression of evidence . . . has always been our last resort, not our first impulse." *Id.*, at 591.

In *Herring v. United States*, 555 U.S. 135 (2009), the Supreme Court found that the exclusionary rule did require suppression of drugs and a firearm found by officers in a search incident to arrest of a defendant. The Court explained that "the exclusionary rule serves to deter deliberate, reckless, or grossly negligent conduct, or in some circumstances recurring or systemic negligence. The error in this case does not rise to that level." *Id.* at 144.

In this case, the district court found that the officers acted in good faith in the face of "strange and unknown circumstances." JA 488.

Assuming this Court finds that the police were acting with a non-investigatory purpose when they first entered the van, a technical, or negligent violation of the Kannapolis City Code of Ordinances or the Kannapolis Police Towing Policy—if found by this Court—should not merit exclusion of the evidence that was derived therefrom. The exclusionary rule as applied here would not serve as a general deterrent to police.

*(This portion of the page intentionally left blank.)*

## <u>CONCLUSION</u>

This Court should affirm the judgment of the district court.


Respectfully submitted,

SANDRA J. HAIRSTON
United States Attorney


/S/ GRAHAM T. GREEN
Assistant United States Attorney
NCSB #22082
United States Attorney's Office
Middle District of North Carolina
251 N. Main Street, Ste. 726
Winston-Salem, NC  27101
Phone:  336/333-5351


/S/ CRAIG M. PRINCIPE
Assistant United States Attorney
NCSB #44720
United States Attorney's Office
Middle District of North Carolina
101 S. Edgeworth Street, 4th Floor
Greensboro, NC 27401
Phone:  336/333-5351


Date: October 11, 2022

# UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
**Effective 12/01/2016**

No. 21-4687    **Caption:**  United States v. Alexander Hillel Treisman

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT
Type-Volume Limit, Typeface Requirements, and Type-Style Requirements

**Type-Volume Limit for Briefs:** Appellant's Opening Brief, Appellee's Response Brief, and Appellant's Response/Reply Brief may not exceed 13,000 words or 1,300 lines. Appellee's Opening/Response Brief may not exceed 15,300 words or 1,500 lines. A Reply or Amicus Brief may not exceed 6,500 words or 650 lines. Amicus Brief in support of an Opening/Response Brief may not exceed 7,650 words. Amicus Brief filed during consideration of petition for rehearing may not exceed 2,600 words. Counsel may rely on the word or line count of the word processing program used to prepare the document. The word-processing program must be set to include headings, footnotes, and quotes in the count. Line count is used only with monospaced type. See Fed. R. App. P. 28.1(e), 29(a)(5), 32(a)(7)(B) & 32(f).

**Type-Volume Limit for Other Documents if Produced Using a Computer:** Petition for permission to appeal and a motion or response thereto may not exceed 5,200 words. Reply to a motion may not exceed 2,600 words. Petition for writ of mandamus or prohibition or other extraordinary writ may not exceed 7,800 words. Petition for rehearing or rehearing en banc may not exceed 3,900 words. Fed. R. App. P. 5(c)(1), 21(d), 27(d)(2), 35(b)(2) & 40(b)(1).

**Typeface and Type Style Requirements:** A proportionally spaced typeface (such as Times New Roman) must include serifs and must be 14-point or larger. A monospaced typeface (such as Courier New) must be 12-point or larger (at least 10½ characters per inch). Fed. R. App. P. 32(a)(5), 32(a)(6).

This brief or other document complies with type-volume limits because, excluding the parts of the document exempted by Fed. R. App. R. 32(f) (cover page, disclosure statement, table of contents, table of citations, statement regarding oral argument, signature block, certificates of counsel, addendum, attachments):

   X   this brief or other document contains 6,039 words

      this brief uses monospaced type and contains lines

This brief or other document complies with the typeface and type style requirements because:

   X   this brief or other document has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in Century Schoolbook 14 **or**

      this brief or other document has been prepared in a monospaced typeface using _____ in _____ .

        (s) AUSAs Graham T. Green & Craig M. Principe

Party Name: United States of America /Appellee

Dated: October 11, 2022

34

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on October 11, 2022, I electronically filed the foregoing with the Clerk of Court using the CM/ECF System, which will send notice of such filing to the following registered CM/ECF user:

Daniel M. Blau, Esquire

> /S/ CRAIG M. PRINCIPE
> Assistant United States Attorney
> NCSB #44720
> United States Attorney's Office
> Middle District of North Carolina
> 101 S. Edgeworth Street, 4th Floor
> Greensboro, NC 27401
> Phone:  336/333-5351